# United States District Court

## DISTRICT OF SOUTH DAKOTA
### CENTRAL DIVISION

FILED

AUG 1 1 2009

CLERK

| | |
|---|---|
| THOMAS ANDREW WAGER,<br><br>                    Plaintiff,<br><br>    vs.<br><br>CLARK MATERIAL HANDLING COMPANY, a Delaware corporation; INGERSOLL-RAND COMPANY, a New Jersey Corporation; VOLVO CONSTRUCTION EQUIPMENT NORTH AMERICA, INC., a Delaware corporation; CMI TEREX CORPORATION, an Oklahoma corporation; BALDOR ELECTRIC CO., a Missouri corporation; ROCKWELL AUTOMATION, INC., a Delaware corporation; RENO HYDRAULIC & REBUILD, INC., a Nevada corporation; and BITUMINOUS PAVING, INC., a Minnesota corporation,<br><br>                    Defendants. | CIV. 09- 3015<br><br><br><br><br><br>**COMPLAINT**<br>**AND**<br>**JURY DEMAND** |

Plaintiff, for his complaint against the defendants, states and alleges as follows:

## JURISDICTION

1.       This action is brought pursuant to 28 USC § 1332 in that the parties are

citizens of different states and the amount in controversy is in excess of Seventy-five

Thousand Dollars ($75,000.00), exclusive of costs and interest.  Jurisdiction is proper.

## NATURE OF THE ACTION

2.      This is an action for damages for personal injuries sustained by Thomas Andrew Wager (hereafter "Andy").

## VENUE

3.      Pursuant to 28 USC § 1391, venue for this cause of action is in the Central Division of the District of South Dakota because the acts and omissions complained of occurred in Jerauld County, State of South Dakota.  This court has proper venue.

## PARTIES

**Plaintiff:**

4.      Andy at all times material to this complaint was a citizen of and a person residing in the State of South Dakota.

**Defendant Clark:**

5.      Defendant Clark Material Handling Company, Inc. (hereafter "Clark Material Handling"), is a corporation organized under and by virtue of the laws of the State of Delaware with its principal place of business in Lexington, Kentucky.

6.      Defendant Ingersoll-Rand Company, (hereafter "Ingersoll-Rand"), is a corporation organized under and by virtue of the laws of the State of New Jersey with its principal place of business in Piscataway, New Jersey.

7.      Defendant Volvo Construction Equipment North America, Inc., (hereafter "Volvo"), is a corporation organized under and by virtue of the laws of the State of Delaware with its principal place of business in Asheville, North Carolina.

8.    Upon information and belief, Clark Material Handling is a former division of Clark Equipment Company, which was divested in 1992.  Upon information and belief, Clark Equipment Company merged with Ingersoll-Rand in 1995.  Upon information and belief, Ingersoll-Rand sold its road construction division to Volvo in 2007.  Hereafter, references to "Clark" shall also include defendants Clark Equipment Company, Clark Material Handling, Ingersoll-Rand, and Volvo.

9.    Upon information and belief, the windrow elevator involved in the incident which forms the basis of the complaint was manufactured by Clark and/or Clarco.

10.    Upon information and belief, Andy alleges that at all times material herein Clark was engaged in the business of designing, manufacturing, compounding, distributing, selling, or otherwise providing windrow elevators for use in the state of South Dakota and other states.

**Defendant Clarco:**

11.    Defendant CMI Terex Corporation, (hereafter "CMI"), is a corporation organized under and by virtue of the laws of the State of Oklahoma with its principal place of business in Oklahoma City, Oklahoma.

12.    Upon information and belief, Clarco was a brand or division of CMI Corporation.  Upon information and belief, CMI Corporation was acquired by Terex Roadbuilding in 2001 and formed CMI Terex Corporation.  Hereafter, references to "Clarco" shall also include defendant CMI Terex.

13.    Upon information and belief, the windrow elevator involved in the incident which forms the basis of the complaint was manufactured by Clark and/or Clarco.

14.     Upon information and belief, Andy alleges that at all times material herein Clarco was engaged in the business of designing, manufacturing, compounding, distributing, selling, or otherwise providing windrow elevators for use in the state of South Dakota and other states.

**Defendant Dodge:**

15.     Defendant Baldor Electric Co. (hereafter "Baldor") is a corporation organized under and by virtue of the laws of the State of Missouri with its principal place of business in Fort Smith, Arkansas.

16.     Defendant Rockwell Automation, Inc. (hereafter "Rockwell"), is a corporation organized under and by virtue of the laws of the State of Delaware with its principal place of business in Milwaukee, Wisconsin.

17.     Upon information and belief, a component known as a Dodge torque arm speed reducer installed on the windrow elevator involved in the incident which forms the basis of the complaint was manufactured by Dodge.  Upon information and belief, Dodge was a division of Rockwell until 2004 when it was acquired by Baldor.  Hereafter, references to "Dodge" shall include defendants Rockwell and Baldor.

18.     Upon information and belief, Andy alleges that at all times material herein Dodge was engaged in the business of designing, manufacturing, compounding, distributing, selling, or otherwise providing torque arm speed reducers for use in the state of South Dakota and other states which torque arm speed reducer was a component part of the windrow elevator that was involved in the incident that forms the basis of this complaint.

**Defendant Reno:**

19.     Defendant Reno Hydraulic & Rebuild, Inc. (hereafter "Reno"), is a corporation organized under and by virtue of the laws of the State of Nevada with its principal place of business in Sparks, Nevada.

20.     Upon information and belief, Andy alleges that at all times material herein, Reno was engaged in the business of designing, manufacturing, compounding, installing, distributing, selling, or otherwise providing the hydrostatic transmission system on the windrow elevator which was involved in the incident that forms the basis of this complaint for use in the state of South Dakota and other states.

**Defendant Bituminous:**

21.     Defendant Bituminous Paving, Inc., (hereafter "Bituminous"), is a corporation organized under and by virtue of the laws of the State of Minnesota with its principal place of business in Ortonville, Minnesota.

22.     Upon information and belief, Andy alleges that at all times material herein Bituminous was engaged in the business of selling, leasing or otherwise providing the windrow elevator which was involved in the incident that forms the basis of this complaint and other road construction equipment for use in the state of South Dakota and other states.

**FACTS COMMON TO
ALL CAUSES OF ACTION**

23.     At all times material to this complaint, Andy and his fellow worker, Ryan Stroschein (hereafter "Ryan"), were acting in furtherance of the business objectives of

Upper Plains Contracting, Inc. (hereafter "UPCI"), and within the course and scope of their employment with UPCI. UPCI is a corporation organized and existing under the laws of the State of South Dakota with its principal place of business in Aberdeen, South Dakota.

24.     For all actions giving rise to this complaint, UPCI, Andy and Ryan were and are subject to the workers' compensation laws of the State of South Dakota.

25.     On August 16, 2006, Andy and Ryan were members of a road construction crew with UPCI and were cleaning accumulated asphalt from two road construction machines known as a paver and a Clark and/or Clarco windrow elevator (S/N 88-164), also known as an asphalt combine or a pick up machine (hereafter "windrow elevator"). The subject of this action is the windrow elevator.

26.     Upon information and belief and at all times material to this complaint, the windrow elevator was leased by Bituminous to UPCI for use in its road construction business.

27.     At all times material to this complaint, the windrow elevator operated as follows:

   a.     The windrow elevator attached at its lower rear end by bolted connections to the front end of the hopper on the paver;

   b.     The paver was self-propelled and provided ground propulsion for the windrow elevator;

   c.     The windrow elevator had a diesel engine at its top front that powered a double-chain scraper conveyor;

d.   The windrow elevator had a master switch at the engine front while its operating controls were located on a panel on the right side of the machine;

e.   During normal road paving operations, independent grinder and pug mill machines led the procession and deposited a windrow of asphalt material on the roadbed;

f.   The windrow elevator, affixed to the paver hopper, followed the pug mill and picked up the windrow from the ground with scraper flights, elevated the asphalt material at an approximately 25° angle, and discharged it into the paver hopper; and

g.   Figure 1 is a photograph of the front of the subject windrow elevator in the foreground connected to the paver in the background shown in the same configuration as when Andy was cleaning the paver hopper on August 16, 2006.



Figure 1

28.     During normal use, asphalt accumulated on the scraper flights and other surfaces of the windrow elevator, as well as the paver hopper, thus requiring regular and routine removal.

29.     At all times material to this complaint, removing the asphalt from the windrow elevator involved the following procedure:

a.     A worker or workers manually chiseled, hammered or scraped the scraper flights that were accessible from either the inlet opening at the front of the machine or from the discharge chute at the rear of the machine;

b.     Once the accessible scraper flights were cleared of asphalt they then had to be advanced to permit access to the remaining scraper flights;

c.     The scraper flights could only be advanced by turning on the diesel engine of the windrow elevator and utilizing a toggle switch on the control panel at the right side of the machine to engage the transmission from neutral to forward or reverse the scraper flights;

d.     The worker incrementally advanced the scraper flights and repeated the process until each of the approximately 27 scraper flights had been accessed and cleaned; and

e.     Figure 2 is a photograph of two scraper flights of the windrow elevator accessible from the top rear of the machine.  Figure 3 is a photograph of the control panel on the right side of the windrow elevator.




Figure 2                                        Figure 3

30.     At all times material to this complaint, defendants knew that the operation

and cleaning of the windrow elevator created a hazardous condition for persons

operating, using or otherwise in close proximity to the windrow elevator.

31.     On August 16, 2009, the following events occurred:

a.      Andy and another co-worker were using air-powered chisels to remove

        asphalt that had accumulated inside the hopper area of the paver, which was

        connected to the rear of the windrow elevator;

b.      Ryan was removing accumulated asphalt from the scraper flights at the

        inlet opening at the front of the windrow elevator;

c.      At all times material to this complaint, the diesel engine of the windrow

        elevator was running;

d.      Unbeknownst to Andy, Ryan had finished clearing those scraper flights

        accessible to him at the inlet opening and had moved to the right side of the

        windrow elevator to the control panel to advance the scraper flights;

e.    At or about that same time and believing that Ryan was still at the front of the windrow elevator, Andy stood up in the paver hopper and leaned into the discharge chute of the windrow elevator to yell down to Ryan to come around to the rear of the paver to help clear out the loose asphalt in the bottom of the hopper;

f.    Ryan could not see or hear Andy from his position at the control panel and flipped the toggle switch to engage the transmission to advance the scraper flights on the windrow elevator; and

g.    Without any warning to Andy, the scraper flights immediately engaged and advanced and struck Andy at the back of his neck pulling him partially into the windrow elevator.

32.    As a direct result of becoming entangled in the windrow elevator, Andy sustained severe and catastrophic injuries; including, but not limited to, spinal cord disruption at C4 resulting in quadriplegia.

33.    The actions or omissions of Ryan and UPCI do not give rise to an intentional tort by either upon Andy. Ryan and UPCI, therefore, are immune from suit, pursuant to SDCL § 62-3-2. Neither Ryan nor UPCI are joint tortfeasors under South Dakota law.

34.    At all times material to this complaint, defendants failed to provide adequate safeguards, warnings and instruction necessary for the safe operation and cleaning of the windrow elevator.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY

35.    Plaintiffs hereby incorporate by reference all statements and allegations contained in paragraphs 1 through 34 above as if fully set forth herein.

36.    Defendants had a duty to design, manufacture, assemble, and distribute for sale or lease a windrow elevator that was not unreasonably dangerous, and a duty to adequately and properly provide safety features, warnings and instruction intended to prevent injury or death and ensure the safety of the windrow elevator's operators, users and others in close proximity to the machine.

37.    Defendants promoted, marketed, warranted, inspected, supplied, sold and leased the windrow elevator in a defective condition that was not contemplated by the ultimate consumer and was capable of causing and did cause catastrophic injuries to Andy.

38.    At all times material herein, the windrow elevator and its component parts were defective as to design, manufacture, warnings and instruction rendering the windrow elevator unreasonably dangerous for its intended normal use.

39.    Defendants placed the windrow elevator in the stream of commerce with actual or constructive knowledge that it was unreasonably dangerous due to defects in design, manufacture, warning, testing, warranty, assembly, installation, distribution and instruction.  Said machine defects constituted unreasonably dangerous conditions for operators, users and others in close proximity to the machine exposing such persons to the unreasonable risk of catastrophic injury or death.

40.     At the time of the accident involving Andy, the defective windrow elevator was without substantial material change from the condition in which it left defendants' control and entered the stream of commerce.

41.     At all times material herein, the defective windrow elevator was being used by UPCI and Andy in a reasonably foreseeable manner, thereby rendering the same unsafe and unreasonably dangerous for use by the consumer.

42.     At all times material herein, non-defective windrow elevators were economically and technologically feasible and an alternative, safer design would have reduced and/or eliminated the risk of Andy's severe injuries without substantially impairing the windrow elevator's purpose.

43.     Defendants are strictly liable for the defective and unreasonably dangerous design, manufacture, warning and instruction of the windrow elevator in the following respects:

a.      By defectively designing, compounding and manufacturing the windrow elevator below state of the art technology at the time;

b.      By failing to implement known, feasible, alternate designs and methods of manufacture;

c.      By inadequately warning foreseeable consumers of the tendency of the windrow elevator to suddenly advance the scraper flights as part of its normal and expected use;

d.      By delivering said windrow elevator into the stream of commerce without making proper inspection as to its quality and suitability for the purposes

intended, or with conscious disregard for defects discovered during inspection;

e.   By failing to provide adequate and appropriate instruction to foreseeable consumers of safe practices and procedures for operating the windrow elevator;

f.   By giving express and implied warranties through advertisement and representation that the windrow elevators manufactured by defendants would be safe and suitable for the normal and foreseeable purposes intended; and

g.   By otherwise failing to meet the standards of design, manufacture, warranty, warning, testing, assembly, installation, distribution and instruction requisite in the industry, and as such, creating an unreasonably dangerous product.

44.   As a direct and proximate result of the acts and omissions of the defendants as alleged herein, Andy sustained severe and catastrophic injuries and suffered damages as more particularly set forth below in the section of this Complaint entitled "Damages."

## SECOND CAUSE OF ACTION
## NEGLIGENCE

45.   Andy hereby incorporates by reference all statements and allegations contained in paragraphs 1 through 44 above as if fully set forth herein.

46.   Defendants had a duty to design, manufacture, assemble, and distribute a windrow elevator that was reasonably safe for its intended purpose.

47.     Defendants had a duty to adequately and properly provide safety features, warnings and instruction intended to prevent injury and ensure the safety of the windrow elevator's operators, users and others in close proximity to the machine.

48.     Defendants so negligently designed, compounded, manufactured, constructed, assembled, inspected, sold or otherwise distributed the windrow elevator that it was unreasonably dangerous and unsafe for its intended purposes.

49.     Defendants negligently failed to warn consumers about the propensity of the windrow elevator to advance the scraper flights suddenly, which is a danger that was unknown and not obvious to the operators, users and others in close proximity to the machine.

50.     At all times material herein, defendants were negligent with regard to their duty to exercise reasonable care in the manufacture, design and distribution of the windrow elevator in the following respects:

a.     Failure to meet the standards of care requisite in the industry;

b.     Failure to adopt a reasonably safe design and method of manufacture for a windrow elevator so that the windrow elevator was free from unreasonably dangerous defects unknown to the foreseeable consumer;

c.     Failure to select and use state of the art materials at the time the windrow elevator was designed, manufactured and assembled;

d.     Failure to implement known, feasible, alternate designs and methods of manufacture;

e.    Failure to reasonably test the windrow elevator, or negligently disregarded unfavorable test results, and therefore failed to protect those operators, users and others in close proximity to the machine against the foreseeable hazards and dangers of defective windrow elevators;

f.    Failure to otherwise meet the standards of design, testing, manufacture, warning, assembly, installation and distribution requisite in the industry to reasonably protect operators, users and others in close proximity to the machine against the foreseeable hazards and dangers of defective windrow elevators; and

g.    Andy reserves the right to allege statutory and regulatory violations as those violations are discovered through the course of discovery.

51.    Andy alleges that the defendants knew or reasonably should have known of a defect in the windrow elevator and negligently failed to disclose the presence of a product defect or warn of the safety limitations.

52.    As a direct and proximate result of the acts and omissions of the defendants as alleged herein, Andy sustained severe and catastrophic injuries and suffered damages as more particularly set forth below in the section of this Complaint entitled "Damages.

## THIRD CAUSE OF ACTION
## BREACH OF WARRANTIES

53.    Andy hereby incorporates by reference all statements and allegations contained in paragraphs 1 through 52 above as if fully set forth herein.

54.     Defendants were engaged in the business of selling windrow elevators, and as such, impliedly warranted that the windrow elevator was suitable for the ordinary purpose for which the windrow elevator was used, and that the windrow elevator was reasonably merchantable at the time of sale.

55.     Andy relied on defendants' skill and judgment and relied on defendants' warranties.

56.     The windrow elevator suddenly advanced the scraper flights without warning during ordinary use.

57.     The windrow elevator was not fit for the ordinary purpose for which it was to be used, and the windrow elevator was unmerchantable at the time of sale.  As a result, defendants breached the implied warranty of fitness for purpose, and the implied warranty of merchantability.

58.     Defendants expressly warranted, by affirmation of fact or promise, that the windrow elevator possessed certain attributes upon which Andy, through UPCI, relied, including the representation that the windrow elevator would not suddenly advance the scraper flights without warning.

59.     Andy relied on defendants' express representations that the windrow elevator would be safe for ordinary use.  The windrow elevator suddenly advanced the scraper flights without warning during ordinary use, and as a result, defendants breached express warranties.

60.     The windrow elevator was defective at the time of its sale, and as such, defendants breached the express and implied warranties that the windrow elevator would be safe for ordinary use.

61.     As a direct and proximate result of the acts and omissions of the defendants as alleged herein, Andy sustained severe and catastrophic injuries and suffered damages as more particularly set forth below in the section of this Complaint entitled "Damages."

## FOURTH CAUSE OF ACTION
## DAMAGES

62.     Andy realleges and incorporates by reference hereto paragraphs 1 through 61 as though they were fully set forth herein.

63.     As a direct and proximate result of the actions and omissions of defendants, Andy sustained severe bodily and personal injuries; including, but not limited to the following:

a.      Mechanical trauma with fracture and/or subluxation at C4 resulting in ASIA A Complete; that is, spinal cord disruption at C4 resulting in quadriplegia with no motor or sensory function preserved in the sacral segments S4-S5;

b.      Dissection of the thoracic aorta at the level of the arch;

c.      Neurogenic bladder;

d.      Neurogenic bowel;

e.      Chronic venous insufficiency;

f.      Orthostatic hypotension;

g.      Bilateral lower extremity edema;

h.      Skin breakdown;

i.      Chronic pain; and

j.      Dependent for all activities of daily living.

64.     Andy, as a direct and proximate result of the wrongful actions and omissions of defendants, sustained injuries and damages including, but not limited to, past medical and caretaking expenses in an amount exceeding $1,500,000.00, future medical and caretaking expenses, together with permanent disability and disfigurement, lost wages and loss in earning capacity, past and future pain, suffering and loss in quality of life, all in an amount in excess of $75,000.0 as determined by the trier of fact.

**WHEREFORE**, Plaintiff prays as follows:

1.      For a judgment against defendants on all Causes of Action and in an amount in excess of $75,000.00, exclusive of interest and costs, as shall be determined by the trier of fact.

2.      For his costs, disbursements, interest and attorney's fees.

3.      For such other and further relief as the Court deems just and equitable.

Dated at Aberdeen, South Dakota, this 10th day of August, 2009.

BANTZ, GOSCH & CREMER, LLC

Attorneys for Plaintiff
Ronald A. Wager
P.O. Box 970
Aberdeen, SD  57402-0970
(605) 225-2232
rwager@bantzlaw.com

## JURY TRIAL DEMANDED

## DEMAND FOR JURY TRIAL

The plaintiff, by and through counsel and pursuant to Federal Rule of Civil Procedure 38, requests this matter be tried to a jury and submits the requisite fee herewith.

Dated this 10th day of August, 2009.

BANTZ, GOSCH & CREMER, LLC

_____
Attorneys for Plaintiff
Ronald A. Wager
305 Sixth Avenue S.E.
P.O. Box 970
Aberdeen, SD  57402-0970
(605) 225-2232
rwager@bantzlaw.com